United States Court of Appeals,

Fifth Circuit.

No. 94-20040.

Robert R. MOONEY, et al., Plaintiffs-Appellants,

v.

ARAMCO SERVICES CO., et al., Defendants,

Arabian American Oil Co., Defendant-Appellee.

James Elliott McMILLAN, et al., Plaintiffs,

Raymond V. Aberle, et al., Plaintiffs-Appellants,

v.

ARAMCO SERVICES CO., et al., Defendants,

Arabian American Oil Co., Defendant-Appellee.

Thomas F. KAUS, et al., Plaintiffs,

Raymond V. Aberle, et al., Plaintiffs-Appellants,

v.

ARAMCO SERVICES CO., et al., Defendants,

Arabian American Oil Co., Defendant-Appellee.

Arthur G. BRUNST, et al., Plaintiffs,

Raymond V. Aberle, et al., Plaintiffs-Appellants,

v.

ARABIAN AMERICAN OIL CO., Defendant-Appellee.

Robert OLSON, et al., Plaintiffs,

Raymond V. Aberle, et al., Plaintiffs-Appellants,

v.

ARABIAN AMERICAN OIL CO., Defendant-Appellee.

John R. RICHARDS, et al., Plaintiffs,

1

Raymond V. Aberle, et al., Plaintiffs-Appellants,

v.

ARABIAN AMERICAN OIL CO., Defendant-Appellee.

William V. OZOLIN, et al., Plaintiffs,

Kenneth O. Olson, et al., Plaintiffs-Appellants,

v.

ARABIAN AMERICAN OIL CO., Defendant-Appellee.

June 20, 1995.

Appeal from the United States District Court for the Southern District of Texas.

Before REAVLEY, DUHÉ and PARKER, Circuit Judges.

DUHÉ, Circuit Judge:

Appellants appeal from the "decertification" of their Age Discrimination in Employment Act representative action and from certain rulings made by the district court during the trial of six individual plaintiffs.  We affirm.

## I. BACKGROUND

Appellants[1] are eighty-five[2] former managerial and skilled employees terminated under Aramco's "Manpower Control Program" during 1984-87.  In 1987, Robert Mooney, William Holcomb and John Marcum filed their representative complaint alleging unlawful

---

[1]"Appellants" refers to the opt-in plaintiffs collectively. "Trial Plaintiffs" refers to the Appellants that actually proceeded to trial, *i.e.,* Robert R. Mooney, John Marcum, William Holcomb, Kenneth Olson, Bobby Joe Williams and Gustav Thim.

[2]As discussed below, the representative action originally contained 154 members.  Since the class decertification and dismissal order was entered, several plaintiffs have died, filed individual actions or have otherwise elected not to participate in this appeal.

termination in violation of the Age Discrimination in Employment Act (ADEA). Other plaintiffs filed similar ADEA complaints in the same court and in the District of Delaware.

On Aramco's motion, the Delaware court transferred its cases to Texas. After the transfer, on Appellants' motion, the Texas court (hereinafter district or trial court) ordered consolidation of the cases. In November 1989, Judge Lynn Hughes authorized notice of the ADEA class proceeding to persons age 40 and over who were terminated under the Aramco Manpower Control Program (MPC) on or after October 9, 1984.[3] Eventually, 154 persons (including the original 18 plaintiffs in the consolidated action) elected to "opt-in" to the representative action. Thereafter, the case proceeded on a collective basis. Aramco deposed many of the plaintiffs, and all parties conducted extensive, class-wide discovery.

In June 1992, the consolidated cases were reassigned to Judge Ewing Werlein. In response to a request from Judge Werlein, Plaintiffs proposed a two-phase "pattern or practice" trial, modeled on *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Aramco argued that the cases should proceed as individual actions, and moved that the "class" be dissolved because plaintiffs were not "similarly situated." In May 1993, the district court ordered the parties to select eight "party plaintiffs" for "the first trial" in October 1992.

---

[3]Approximately 1800 notices were sent.

In August 1992, approximately six weeks before trial, the district court granted Aramco's motion to dissolve the "class" and dismissed all of the opt-in plaintiffs, including six of the eight plaintiffs who had been selected for trial. In September 1992, the district court denied Aramco's motion to dismiss Appellants' pattern and practice claim, and six individual plaintiffs proceeded to trial on October 4, 1992. The jury found for Aramco on all six claims.

## II. DENIAL OF REPRESENTATIVE ACTION

The ADEA, at 29 U.S.C. § 626(b), explicitly incorporates section 16(b) of the Fair Labor Standards Act,[4] which provides that a person may maintain an action on "behalf of himself ... and other employees *similarly situated.* No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b) (emphasis supplied). A difference between an ADEA representative action and a Fed.R.Civ.P. 23 class action is that the ADEA action follows an "opt-in" rather than an "opt-out" procedure. *See La Chapelle v. Owens-Illinois, Inc.,* 513 F.2d 286, 289 (5th Cir.1975). However, in discussing the representative action, most courts utilize class action terminology from Rule 23 cases.

*A. Standard of Review*

In the Fed.R.Civ.P. 23 context, a district court's class certification or decertification decision is reviewed under a

---

[4]29 U.S.C. § 216(b).

clearly erroneous standard. *See Merrill v. Southern Methodist University,* 806 F.2d 600, 607 (5th Cir.1986),

> We review the district court's refusal to certify the class on an abuse of discretion standard. On appeal, however, we examine not only the evidence available to the district court, but also "the facts developed at the trial of plaintiffs' individual claims."

(citations omitted); *Briggs v. Anderson,* 796 F.2d 1009, 1017 (8th Cir.1986) (abuse of discretion review of district court's decision to decertify the class). Appellee argues that the same standard should be applied to an ADEA certification/decertification determination.

Appellants, on the other hand, argue that this court should exercise plenary review because the district court employed an incorrect legal standard. For this proposition, Appellants cite *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1104-06 (5th Cir.1993). Therein, we employed a *de novo* standard to review whether the district court properly applied Fed.R.Civ.P. 23 to a class certification question.

We hold that the ADEA decertification decision requires a two-part standard of review. The initial question—i.e. what legal standard should the district court have used—is a question of law to be reviewed *de novo.* Once the correct legal standard is ascertained, the district court's *application* of the standard must be reviewed for abuse of discretion.

*B. The Meaning of "Similarly Situated"*

The center of this dispute is what "similarly situated" means in the ADEA context. Although there are many district court cases

addressing the issue, the proper class certification procedure for an ADEA representative action is largely a matter of first impression for the circuit courts. The district court cases seem to divide along two basic lines.

1. Two-Stage Class Certification

The first line of cases is typified by *Lusardi v. Xerox Corp.,*[5] and represents the method followed by the trial court in this matter.[6] *Lusardi* and its progeny are remarkable in that they do not set out a definition of "similarly situated," but rather they define the requirement by virtue of the factors considered in the "similarly situated" analysis.[7] In other words, this line of

---

[5]*Lusardi v. Xerox Corp.,* 118 F.R.D. 351 (D.N.J.1987), *mandamus granted in part, appeal dismissed, Lusardi v. Lechner,* 855 F.2d 1062 (3rd Cir.1988), *vacated in part, modified in part, and remanded, Lusardi v. Xerox Corp.,* 122 F.R.D. 463 (D.N.J.1988), *aff'd in part, appeal dismissed, Lusardi v. Xerox Corp.,* 975 F.2d 964 (3rd Cir.1992).

[6]Appellants advance *Sperling v. Hoffman-La Roche, Inc.,* 118 F.R.D. 392, 407 (D.N.J.1988), *aff'd in part and appeal dismissed in part,* 862 F.2d 439 (3rd Cir.1988), *aff'd and remanded, Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989), as a different approach to the "similarly situated" inquiry. Upon careful examination, however, it is obvious that the *Sperling* court only addressed class certification at the notice stage. In fact, the court leaves open the possibility of future decertification of the class. *See id.* at 407 ("[N]othing would appear to prevent the court from modifying or reversing a decision on "similar situations' at a later time in an action, as new facts emerge."). We read the *Sperling* case as simply another example of the two-stage *Lusardi* analysis.

[7]Four factors were named as the primary reasons for the initial decertification of the *Lusardi* class. *See Lusardi v. Xerox Corp.,* 118 F.R.D. 351, 359 (D.N.J.1987),

> For several reasons, including (1) the disparate
> factual and employment settings of the individual
> plaintiffs; (2) the various defenses available to

6

cases, by its nature, does not give a recognizable form to an ADEA representative class, but lends itself to *ad hoc* analysis on a case-by-case basis.

Under *Lusardi,* the trial court approaches the "similarly situated" inquiry via a two-step analysis. The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the

> Xerox which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) the apparent absence of filings required by the ADEA prior to instituting suit, the class will be decertified.

On remand, the *Lusardi* court examined a variety of factors, and again decided to decertify the class.

> The members of the proposed class come from different departments, groups, organizations, sub-organizations, units and local offices within the Xerox organization. The opt-in plaintiffs performed different jobs at different geographic locations and were subject to different job actions concerning reductions in work force which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis. This case should not continue in a class status.

....

> There is no commonality amoung [sic] the people who were subject to more than sixty-five separate reductions in force, virtually all of which occurred at separate points in time. In the absence of one corporate wide reduction in force, about all that the members of the proposed class have in common is their termination and age within the protected range. The disparate individual defenses asserted by Xerox heightens the individuality of the claims and complicates the significant management problems.

*Lusardi v. Xerox Corp.,* 122 F.R.D. 463, 465-66 (D.N.J.1988) (citations omitted).

action should be given to potential class members.

Because the court has minimal evidence, this determination is made using a fairly lenient standard,[8] and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives—i.e. the original plaintiffs—proceed to trial on their individual claims. Based on our review of the case law, no representative class has ever survived the second stage of review.

2. Spurious Class Action

The second line of cases is typified by *Shushan v. University of Colorado,* 132 F.R.D. 263 (D.Colo.1990). *Shushan* espouses the

_____

[8]At the notice stage, "courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Sperling v. Hoffman-La Roche, Inc.,* 118 F.R.D. at 407.

view that § 16(b) of the Fair Labor Standards Act (FLSA) merely breathes new life into the so-called "spurious" class action procedure previously eliminated from Fed.R.Civ.P. 23. Building on this foundation, the court determined that Congress did not intend to create a completely separate class action structure for the FLSA and ADEA context, but merely desired to limit the availability of Rule 23 class action relief under either Act. In application, the court determined that Congress intended the "similarly situated" inquiry to be coextensive with Rule 23 class certification. In other words, the court looks at "numerosity," "commonality," "typicality" and "adequacy of representation" to determine whether a class should be certified. Under this methodology, the primary distinction between an ADEA representative action and a Fed.R.Civ.P. 23 class action is that persons who do not elect to opt-in to the ADEA representative action are not bound by its results. In contrast, Rule 23 class members become party to the litigation through no action of their own, and are bound by its results.

*C. The District Court's Approach*

The *Lusardi* procedure was followed in this case. Judge Hughes made an initial determination that the claimants were similarly situated, and permitted notice to be given to the putative class. Later, after 154 persons had "opted-in," and after extensive discovery had been conducted, Aramco moved to decertify the class. Judge Werlein determined that the claimants were not similarly situated, granted Aramco's motion and dismissed the opt-in

9

plaintiffs without prejudice.

Judge Werlein set out extensive reasons for his finding.

> An analysis of the pertinent facts in the case at bar
> reveals that the would-be members of the ADEA representative
> class were subject to vastly disparate employment situations.
> First ... Plaintiffs were employed by at least 93 different
> Aramco departments scattered over 11 separate locations in
> Saudi Arabia. Virtually every plaintiff worked in a different
> division of the company and held a distinct job title
> requiring different job skills. Moreover, Plaintiffs differ
> significantly in employment characteristics such as job tenure
> (varying from 1 to 34 years), employment history, salary
> grade, qualifications, and education. Plaintiffs were of
> vastly different ages when hired, and varied in age at
> termination from 40 to 68. As discussed in more detail below,
> Plaintiffs were discharged from their employment in several
> different years upon the recommendation of different
> decision-making supervisors for a variety of reasons.

> The specific circumstances of termination alleged by
> Plaintiffs are equally diverse. Deposition testimony from the
> respective Plaintiffs reveals a wide range of claims and
> theories of recovery, including: discriminatory selection for
> RIF, forced retirement, replacement with younger, older,
> American, Saudi, or Muslim employees, and Aramco's refusal to
> transfer Plaintiffs to other departments. Some Plaintiffs
> allege that Aramco should have "bumped" other employees to
> create open positions for them. Still others claim that
> Aramco "retaliated" against them by refusing to rehire them
> after they complained of discriminatory treatment.

> ....

> In view of the hodgepodge of claims and allegations, it is
> clear that the defenses available to Aramco are just about as
> disparate as the Plaintiffs themselves.

> ....

> Moreover, because Aramco, as a defendant in an ADEA action, is
> entitled to articulate "legitimate, nondiscriminatory
> reason[s] for the employees' reaction, including "reasonable
> factors other than age" ("RFOA"), the court's evaluation of
> Aramco's defenses inevitably will require presentation of
> evidence unique to each individual plaintiff.

> ....

> Third, the evidence submitted by Aramco indicates that
> there existed no single company-wide reduction in force

10

("RIF").  As reflected in the affidavits of Aramco officers and supervisors, the downsizing of the Aramco work force was implemented on a highly decentralized level by local management.  In contrast to the cases relied upon by Plaintiffs, wherein the common thread unifying Plaintiffs' claims was a company-wide action executed by a relatively small number of supervisors within a short time period, in the instant case it appears that "the elections for individual terminations were made by hundreds of different supervisors in separate departments with differing constraints and objectives, based upon considerations of various skills, performance factors, and business need in each [of five] year[s]."

.....

These facts, and the absence of any controverting evidence submitted by Plaintiffs, lead the Court to conclude that Aramco's surplussing decisions were made in a manner similar to that in *Lusardi:* between 1984 and 1988, Aramco experienced not one, but well over 297 separate RIFs of expatriate employees.

.....

The facts developed at this time indicate that it would be difficult, if not impossible, to identify as many as two or three of the more than 130 potential Plaintiffs who could be said to be "similarly situated" within the meaning of the ADEA statute.  Moreover, Plaintiffs themselves have made no attempt to identify a smaller group of individuals who might comprise a "similarly situated" sub-class for ADEA purposes.

.....

Other than the global allegations of Plaintiffs that the ADEA was violated, that they were formerly Aramco employees, and that they were in the protected age group over forty, there is no real commonality among the named Plaintiffs and the "opt-in" group.

.....

For numerous reasons, including (1) the widely disparate factual, employment, and discharge histories of the individual Plaintiffs;  (2) the variety of particular, differing, and sometimes unique defenses available to Aramco in contesting the varied and disparate claims of 130 or more former employees;  and (3) fairness and procedural considerations, the Court concludes that Plaintiffs are not "similarly situated" within the meaning of Section 16(b) of the ADEA.

(citations and footnotes omitted).

*D. Analysis*

We find it unnecessary to decide which, if either, of the competing methodologies should be employed in making an ADEA class certification decision. From the record, it is apparent that in this case, no matter how we analyze the similarly situated requirement, we cannot say that the district court abused its discretion in finding that the "opt-in" plaintiffs were not similarly situated. In so holding we specifically *do not* endorse the methodology employed by the district court, and *do not* sanction any particular methodology. We simply need not decide the appropriate methodology under these facts, and therefore leave that inquiry for another day.

### III. MIXED-MOTIVES THEORY[9]

Trial Plaintiffs first assert that the district court erred by failing to instruct the jury on a "mixed-motives" theory of ADEA discrimination under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

*A. Standard of Review*

The standard of review for objections to the district court's jury instructions are set out in *FDIC v. Mijalis,* 15 F.3d 1314, 1318 (5th Cir.1994):

> First, the challenges must demonstrate that the charge as a whole creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." Second, even if the jury instructions were erroneous, we will not

---

[9]The remaining issues relate to the trial of claims of the six individual plaintiffs.

12

reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case. If a party wishes to complain on appeal of the district court's refusal to give a proffered instruction, that party must show as a threshold matter that the proposed instruction correctly stated the law.

*B. Mixed-Motives Theory*

In general, a plaintiff can prove age discrimination in two ways. A plaintiff can prove discriminatory animus by direct evidence or by an indirect or inferential method of proof. Discrimination can be shown indirectly by following the "pretext" method of proof set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence.' " *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985).

If, however, plaintiff produces direct evidence of discrimination, the *McDonnell Douglas* test is "inapplicable." *Id.,* 469 U.S. at 119, 105 S.Ct. at 621. The *Price Waterhouse,* mixed-motives theory of discrimination comes into play where *direct* evidence of discrimination is presented, but the employer asserts that the same adverse employment decision would have been made regardless of discrimination.[10] Although *Price Waterhouse* can be

---

[10]*See e.g. Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3rd Cir.1994),

> [I]n the *Price Waterhouse* framework ... the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely

13

characterized as a method to prove discrimination, the mixed-motives theory is probably best viewed as a defense for an employer.[11]

Unlike *McDonnell Douglas,* which simply involves a shifting of the burden of *production, Price Waterhouse* involves a shift of the burden of *persuasion* to the defendant. In other words, under *Price Waterhouse,* once a plaintiff presents direct evidence of discrimination, the burden of proof shifts to the employer to show that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, plaintiff prevails.

Our prior case law and the *Price Waterhouse* opinion make clear that the mixed-motives and pretext theories require different elements of proof. *See Price Waterhouse,* 490 U.S. at 243 n. 12, 109 S.Ct. at 1787 n. 12,

> Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a "pretext" case or a "mixed-motives" case from the beginning in the District Court; indeed, we expect that plaintiff often will allege, in the alternative, that their cases are both. Discovery often will

---

on any presumption from the *prima facie* case to shift the burden of production. Both the burden of production and the risk of nonpersuasion are shifted to the defendant who, because of the inference the overt evidence showing the employee's bias permits, must persuade the factfinder that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus.

[11]*See Price Waterhouse,* 490 U.S. at 246, 109 S.Ct. at 1788 ("[T]he employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and the employer, if it wishes to prevail, must persuade it on another.").

> be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decisions against her. At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives. If the plaintiff fails to satisfy the fact finder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves, following *Burdine,* that the employer's stated reason for its decision is pretextual.

*See also, Waltman v. International Paper Co.,* 875 F.2d 468, 481 (5th Cir.1989) ("[T]he elements of proof in a sex discrimination claim will vary depending on whether the evidence leads to a discrimination claim based on "mixed motives' or "pretext.' "). In summary, *Price Waterhouse* and *McDonnell Douglas* are alternative methodologies for proving discrimination. To be entitled to an instruction, under either theory, plaintiff must demonstrate that he has submitted evidence of its requisite elements.

*C. Application*

In this case, Trial Plaintiffs requested an instruction which purported to combine the *Price Waterhouse* and *McDonnell Douglas* theories into a single instruction. While the district court gave the jury a *McDonnell Douglas* instruction, the *Price Waterhouse* instruction was rejected. We must determine whether Trial Plaintiffs were entitled to a *Price Waterhouse* instruction.

As mentioned above, the fundamental prerequisite to the mixed-motives instruction is the presentation of *direct evidence* of discrimination.

> In *Brown v. East Mississippi Electric Power Ass'n,* [989 F.2d 858 (5th Cir.1993),] we defined direct evidence in the employment discrimination context: "[d]irect evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." In

15

that case we found that a supervisor's open and routine use of racial slurs "constitutes direct evidence that racial animus was a motivating factor ..." in employment decisions. Similarly, in *Price Waterhouse v. Hopkins,* the Supreme Court indicated the kind of comments that constitute direct evidence of gender discrimination. In that case, one partner referred to the plaintiff as "macho." Another suggested that she "overcompensated for being a woman." A third advised her to take "a course at charm school." And a fourth advised her to "walk more femininely, talk more femininely, dress more femininely ... and wear jewelry." Like the supervisor's comments in *Brown,* these comments directly suggest the existence of bias; no inference is necessary. In both cases, the offending comments cannot reasonably be interpreted as anything other than a reflection of bias—either racial or gender-based.

*Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir.1994)

(per curiam).[12]   Before the *Price Waterhouse* methodology can be

---

[12]*See also Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448-49 (8th Cir.1993),

> What evidence is sufficient to entitle a plaintiff to a *Price Waterhouse* burden-shifting instruction? Initially, it is clear that merely establishing a prima facie case of discrimination is not enough. Rather, the plaintiff must present "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision."
>
> Not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision. In *Beshears* [*v. Asbill,* 930 F.2d 1348 (8th Cir.1991) ], we distinguished "[c]omments which demonstrate a "discriminatory animus in the decisional process' or those uttered by individuals closely involved in employment decisions," from " "stray remarks in the workplace,' "statements by nondecisionmakers,' or "statements by decisionmakers unrelated to the decisional process.' " While evidence of the former type of remark might be sufficient to entitle a plaintiff to a *Price Waterhouse* instruction, we reject the latter as insufficient.

employed, plaintiff bears the "burden of persuasion on the issue of whether [improper factors] played a part in the employment decision." *Price Waterhouse,* 490 U.S. at 246, 109 S.Ct. at 1788.

Trial Plaintiffs advanced several items that they argue constitute direct evidence of discrimination. First is a memorandum by a senior vice president purporting to encourage the early retirement or dismissal of older employees. The memo, however, explicitly excludes American employees from its scope, and therefore does not provide direct evidence of discrimination against Trial Plaintiffs all of whom are American.

The remaining evidence relates to allegedly discriminatory statements made to four of the Trial Plaintiffs by their supervisors. Specifically, Trial Plaintiffs state,

> Thim's supervisor said he wanted to replace Thim with a "younger and cheaper" engineer. Olson's supervisor said that it "must have been your age". Williams's supervisor declared that plaintiff would have a "good case of age discrimination." Mooney heard Dan Christy—the man who recommended his discharge—tell a younger engineer that Aramco was "going to get rid of the older employees with the higher salaries."

These statements fail to constitute *Price Waterhouse* "direct evidence".

Even if we accept the statements at face value, they do not provide discriminatory animus "without inference or presumption." As we have stated previously, "[t]o shift the burden on the employer to show by a preponderance of the evidence that it would have made the same decision even without the forbidden factor, the employee must show that "the employer *actually relied on* [the forbidden factor] in making its decision.' " *Langley v. Jackson*

17

*State University,* 14 F.3d 1070, 1075 (5th Cir.1994) (emphasis in original).

Although the statement allegedly made to Thim[13] and the statement allegedly overheard by Mooney[14] create inferences that age played a part in their terminations, when taken in their entirety, both statements are primarily indicative of a desire to save money by employing persons at lower pay.  The statements to Olson[15] and Williams[16] merely constitute speculation as to possible

---

[13]According to Thim, his supervisor stated, "If I can replace an expensive American expat with a younger and cheaper Brit, I can save the company a lot of money."

[14]Mooney testified in part,

> "Well, as I recall, Dan Lawlor, who was a younger engineer, was afraid that he might be surplussed.  So, he was talking to Dan Christy about this and Dan told him that, "Don't worry.  They're going to get rid of the older employees with the higher salaries."

[15]Olson testified in part,

> "Q. Did you ask Mr. Combs at your January, 1985, meeting why you were being fired?
>
> A. Yes.
>
> Q. What did he tell you?
>
> A. He said it couldn't be because of my performance because that's been excellent.  "So, it must be your age.' "

[16]Williams testified in part,

> "Q. Did you overhear Mr. Churchville make any other comments about your termination at a later date?
>
> A. Yes.  Within a week after I had been given my formal letter I was sitting at my desk and ... I overheard Pat talking to the other person and saying, "Williams has a good case against Aramco for age discrimination."

discrimination in the termination of Trial Plaintiffs.  There is no evidence that Appellee "actually relied on" Trial Plaintiffs' age in making the decision.  While we could *infer* such a conclusion from these statements, we cannot say that they provide "*direct evidence* " of age related animus.[17]

## IV. PATTERN OR PRACTICE CLAIM

*A. Pattern or Practice Jury Instruction*

Trial Plaintiffs argue that their pattern and practice instruction was erroneously excluded.

### 1. Standard of Review

We apply the same standard of review to the district court's exclusion of the requested pattern and practice instruction as we applied in our analysis of the omitted mixed motives instruction.

### 2. Analysis

A "pattern or practice" claim is not a separate cause of action, but merely another method by which disparate treatment can be shown.  The Supreme Court has set out the burden of establishing a "pattern or practice of discrimination."

> [D]emonstrating the existence of a discriminatory pattern or practice establishes a presumption that the individual class members had been discriminated against on account of race.

---

[17]Finally, "even if the jury instructions were erroneous, we will not reverse if we determine, based on the entire record, that the challenged instruction could not have affected the outcome of the case." *FDIC v. Mijalis,* 15 F.3d 1314, 1318 (5th Cir.1994).  Trial Appellants have failed to satisfy this burden. The jury plainly did not believe their testimony under the lower "inferential evidence" standard employed in the *McDonnell Douglas* analysis.  Consequently, a reasonable jury could not have found that the evidence presented constituted the higher level of "direct evidence" necessary to shift the burden of persuasion to the defendant.

*Proving isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination; rather it must be established by a preponderance of the evidence that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice."*

*Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875-76, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (citations omitted, emphasis supplied). Trial Plaintiffs' proposed instruction stated, in relevant part,

If you find that in its selection of employees for termination the defendant regularly and purposefully treated persons age 40 or older less favorably than other employees on account of their age, then you must find that defendant has engaged in a pattern or practice of discrimination.

If you find that the defendant discriminated as a pattern or practice, you must presume that each individual plaintiff was discriminated against. Once a pattern or practice has been proven, the burden of proof shifts to defendant to show by clear and convincing evidence that it would have terminated the plaintiff even if it had not maintained a pattern or practice of age discrimination. Unless defendant makes this showing, you must find that the defendant discriminated against each individual plaintiff.

Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction as to the matter at issue. This involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard; however, proof to an absolute certainty is not required.

Trial Plaintiffs' proposed instruction failed to properly state the law. In the first instance, the instruction fails to state that Trial Plaintiffs must show disparate treatment by a preponderance of the evidence. Second, the instruction fails to include the Supreme Court's caveat that "isolated and individual" acts of discrimination are not sufficient to establish a pattern or practice. Finally, the instruction improperly states that Appellees must prove by "*clear and convincing* evidence that it

would have terminated the plaintiff even if it had not maintained a pattern or practice of age discrimination."[18]  (emphasis supplied).

However, even assuming—as the Trial Plaintiffs contend—that the district court erred by rejecting rather than modifying the requested instruction, Trial Plaintiffs have failed to show that they were entitled to the instruction.  Trial Plaintiffs simply failed to show, either through statistics or anecdotal evidence, that anything other than "sporadic and individual" acts of discrimination occurred.  In fact, the jury reasonably concluded that Trial Plaintiffs had failed to show any individual discrimination.

*B. Pattern or Practice Evidence*

1. Standard of Review

Next Trial Plaintiffs complain of the exclusion of certain witnesses.

A trial judge's ruling on the admissibility of evidence is generally reviewed for an abuse of discretion. *Jon-T Chems., Inc. v. Freeport Chem. Co.,* 704 F.2d 1412, 1417 (5th Cir.1983).  When the admissibility determination necessarily involves a legal

---

[18]Trial Plaintiffs improperly rely on *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 445 (5th Cir.1974), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974), for their contention that a higher standard should be required of Appellees after the burden of proof shifts.  The *Price Waterhouse* Court specifically rejected the idea that upon the shifting of the burden the employer should be required to show non-discrimination by "clear and convincing" evidence rather than be the usual "preponderance" of the evidence standard. *See Price Waterhouse,* 490 U.S. at 252-54, 109 S.Ct. at 1792-93.

decision, this Court should consider the validity of the underlying legal analysis. *See United States v. Beechum,* 582 F.2d 898, 909-18 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Robinson,* 700 F.2d 205, 210 (5th Cir.1983), *cert. denied,* 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984). "We will not reverse a district court's evidentiary rulings unless they are erroneous and substantial prejudice results. The burden of proving substantial prejudice lies with the party asserting error." *FDIC v. Mijalis,* 15 F.3d at 1318-19.

2. Analysis

Trial Plaintiffs assert that the district court abused his discretion by excluding ten[19] anecdotal witnesses relating to their pattern or practice claim. We must start with the district court's ruling on the issue.

> On anecdotal evidence, in my judgment the use of witnesses who are plaintiffs in this litigation and whose case yet has to be tried because they're not being tried at this time ... to allow those persons to testify in this case with regard to their own anecdotal experiences ... the merit of doing that or the probative value of allowing that is outweighed by the overwhelming difficulties that that would cause in efficiently providing a trial to these six plaintiffs and fairly permitting each side to present their cases with regard to these six plaintiffs during the two-week period that has been allowed for trial.
>
> ....

---

[19]At trial, Trial Plaintiffs complained of the exclusion of 17 witnesses, however, according to Trial Plaintiffs, four of the witnesses ultimately testified. Of the remaining 13 witnesses, Trial Plaintiffs briefed their arguments as to only ten witnesses, and therefore have waived their objections to the exclusion of the remaining three witnesses.

22

> *However, in the event that anecdotal evidence is offered with regard to other employees—that is, supervisors, the decision-makers that are involved with respect to these six plaintiffs at times and places that proximately relate to the claims of any of these six plaintiffs on trial—then I do not preclude the plaintiffs from making that type of offer or tender.*
>
> But other *anecdotal evidence that would be unrelated to the cases now on trial I'm going to rule would be excluded,* given the fact that we've got a company here with many thousands of employees, as I understand it.
>
> ....
>
> And when you start going to anecdotal evidence of certain of those individuals, it not only, it seems to me, works an undue burden in a two-week trial upon the defendants to respond or to try to put in a more favorable light to them whatever the evidence may be, but it actually results in trying more than the six claims that we've really set for trial during this two-week period.
>
> And I think that the pattern and practice contentions of the plaintiff will be demonstrated if the evidence shows it ... through statistical data and general policies promulgated by the company or implemented by the company that will be statistically evident ... and, plus, anecdotal evidence directly related to decision-makers or supervisors whose conduct is under attack by these six plaintiffs.

We next note that, as a general rule, anecdotal testimony of individual acts of discrimination is admissible to bolster statistical evidence of disparate treatment. *See e.g. Teamsters,* 431 U.S. at 338, 97 S.Ct. at 1856. However, to be relevant the evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

As set forth above, Trial Plaintiffs' burden under the "pattern or practice" methodology was to show that discrimination "was the company's standard operating procedure—the regular rather

23

than the unusual practice." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855. Thus, to show relevancy, Trial Plaintiffs had to show that the proffered anecdotal witnesses were sufficiently similar to themselves so that the witnesses' testimony would have a tendency to show "standard [discriminatory] operating procedure" and a "regular rather than unusual practice" of discrimination.

Testimony of anecdotal witnesses with different supervisors, working in different parts of the company was simply too attenuated to relate to this threshold issue. Because of their dissimilarity to the Trial Plaintiffs, instead of providing testimony of a company-wide pattern or practice, the excluded anecdotal witnesses' testimony would simply have been evidence of "sporadic and isolated" occurrences. Because the witnesses were not relevant to the Trial Plaintiffs' burden, we find no abuse of discretion in their exclusion.

## V. EXCLUSION OF REBUTTAL TESTIMONY

Trial Plaintiffs next argue that the district court erred by refusing to allow Dr. Erich Prien (Prien) to testify as a rebuttal witness.

*A. Standard of Review*

While our review is for abuse of discretion, we have previously developed a four part test to determine whether the district court properly excluded expert testimony.

> "In reviewing district courts' exercise of discretion in excluding expert testimony, we have previously considered the following four factors: (1) the importance of the excluded testimony, (2) the explanation of the party for its failure to comply with the court's order, (3) the potential prejudice that would arise from allowing the testimony, and (4) the

24

availability of a continuance to cure such prejudice."

*EEOC v. General Dynamics Corp.,* 999 F.2d 113 (5th Cir.1993).

*B. Analysis*

Trial Plaintiffs failed to designate Prien prior to the district court's deadline for designation of expert witnesses. As excuse for the late designation, Trial Plaintiffs asserted that they could not have recognized the necessity of his testimony prior to the designation of Appellee's experts. Trial Plaintiffs made no effort to have Prien designated as an expert for their case in chief, but instead moved to designate him as a rebuttal expert witness. In their motion for leave, Appellants set forth the scope of their designation of Prien:

> One of the witnesses identified by Aramco is Dr. Richard Jeanneret, who is designated as an "expert in industrial and organizational psychology," to present an opinion on "performance appraisal procedures used by Aramco." Plaintiffs previously designated no witness to testify about this subject, except to the extent that plaintiffs' expert Dr. Bernard Siskin will testify that there is a statistically significant pattern that older employees tended to get worse performance ratings.

> The expected testimony of Dr. Jeanneret, based on his report, will attempt to validate the performance appraisal policy at Aramco. Thus, he concluded that "performance ratings were a primary determinant in decisions regarding the involuntary terminations of Aramco employees." He further opined that "[b]ased on my review of the Aramco performance appraisal program, it is my opinion that it is job-related and that no component is inherently biased against individuals age 40 or over." Thus, only part of the report constitutes a direct response to Dr. Siskin; the balance of the report covers a new and different ground.

> ....

> [P]laintiffs began to look for an expert to rebut the report's conclusions with regard to the validity of Aramco's performance appraisal and rating system, and engaged Dr. Prien as a rebuttal witness. Dr. Prien will present opinions about

25

Aramco's performance appraisal policy, which would serve as a direct rebuttal of Dr. Jeanneret's testimony.... Dr. Prien is designated to rebut Aramco's defense that the performance appraisal system was a valid, non-discriminatory method of selecting candidates for surplus.

(citations to record omitted). At trial, Appellees elected not to call Jeanneret, and the court ruled that Trial Plaintiffs could not call Prien as a rebuttal witness.

Trial Plaintiffs contend that although Jeanneret was not called by Appellee, they should have been allowed to call Prien to rebut the testimony of William Walker who, in part, testified to *his experience* with the Aramco performance appraisal system. After reviewing the relevant portions of Walker's testimony, we conclude that he did not testify to matters within the scope of the designation set out by Trial Plaintiffs. Walker did not testify as an expert witness, did not testify to the use of the force ranking system to determine terminations,[20] did not testify to performance appraisal procedures outside of his own department and certainly did not testify to the age neutrality or validity of the performance appraisal system. In short, Prien's testimony was wholly "unimportant" because Appellee's witness provided no testimony within the scope of Prien's designation.

In addition, Appellees would have been greatly prejudiced by Prien's testimony. Although he had been deposed, Appellee's deposition was limited to questions concerning Prien's reaction to Jennerete's report. In other words, at deposition Appellees only

---

[20]In fact, Walker testified that he never had to use a force ranking system in his department.

questioned Prien regarding matters within the scope of his designation. Because Appellees offered no testimony within the scope of his designation, Prien had nothing to rebut, and any testimony would have been unavoidably prejudicial. We find no abuse of discretion in the district court's exclusion of Prien's testimony.

## VI. EXCLUSION OF EX GRATIA CLAIMS

*A. Background*

Appellants' final argument deals with the last-minute exclusion of their *ex gratia* claims. The *ex gratia* claims are based on allegations that Aramco paid employees over the age of 49 substantially smaller severance payments than similar, younger employees with the same length of service. On the first day of trial, the district court granted the Appellee's earlier filed motion to vacate the consolidation order and convert the matter back into seven individual actions. The court held that,

> [I]t's been determined that this is not and cannot proceed as a representative action—it seems to me that each individual plaintiff's claims must be examined with respect to whether they have been perfected, whether limitations has [sic] run independently of the other plaintiffs.

Only one of the original named plaintiffs filed an EEOC charge asserting an *ex gratia* claim. None of the Trial Plaintiffs filed an EEOC charge asserting the claim, nor did any of the Trial Plaintiffs' complaints assert an *ex gratia* claim. As stated by the district court,

> [N]one of the six plaintiffs that are to proceed to trial had asserted an ex gratia claim and all would be barred by limitations if they undertook now to assert such claim.

27

In an attempt to save their *ex gratia* claims, Trial Plaintiffs attempted to resurrect a previously filed motion for leave to file a second amended complaint (filed in one of the Delaware cases), which had sought to add a class-wide *ex gratia* claim. Trial Plaintiffs asserted that filing the second amended complaint would bring them under the "single filing rule," and allow all of the complaints to ride on the single EEOC charge. The district court denied the motion, refused to apply the "single filing rule", and ruled that issues of EEOC charges and limitations would have to be resolved on a case-by-case basis. Trial Plaintiffs argue that the district court thus abused its discretion.

*B. Analysis*

As we have noted previously, "one cannot take legal action in ADEA cases unless one has filed an administrative charge, in cases arising in Texas, within 300 days of the last act of discrimination." *Anson v. Univ. of Tex. Health Science Center,* 962 F.2d 539, 540 (5th Cir.1992). However, "[t]he federal courts now universally hold that an individual who has not filed an administrative charge can opt-in to a suit filed by any similarly situated plaintiff under certain conditions." *Id.* at 541. This so-called "single filing rule" generally allows a plaintiff, *who did not file an EEOC charge,* to piggyback on the EEOC complaint filed by another person who is similarly situated. In this case, *all of the named Trial Plaintiffs filed an individual EEOC charge,* but failed to include an *ex gratia* claim. Trial Plaintiffs now attempt to rely on the *ex gratia* claim contained in the individual

28

EEOC charge of Robert Olson, a named plaintiff who was not included in the group of Trial Plaintiffs. Whether the single filing rule can be used by someone who actually filed a EEOC charge to append an additional claim appears to be matter of first impression.

"It is uncontroversial that the "single filing rule' is not limited to class actions but also can permit a plaintiff to join individual ADEA actions if the named plaintiff filed a timely administrative charge to permit "piggybacking' by the joining plaintiff." *Howlett v. Holiday Inns*, 49 F.3d 189, 195 (6th Cir.1995). Two conditions must be satisfied. First, the person attempting to piggyback must be similarly situated to the person who actually filed the EEOC charge.[21] *See Anson*, 962 F.2d at 541. Second, the charge must provide notice of the collective or class-wide nature of the charge. *See id.* at 541-43. There is no dispute that Olson's EEOC charge contained language purporting to make the *ex gratia* claim class-wide, however, that does not end our inquiry.

The policy behind the single filing rule is that "[i]t would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC." *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir.1968). As long as the EEOC and the company are aware of the

---

[21]As we found previously, Appellants in this matter are not similarly situated to each other or to other claimants. However, the district court did not specifically address whether Trial Plaintiffs might be similarly situated, for purposes of the single filing rule, with regard to the *ex gratia* claim. Because we find that single filing rule inapplicable for other reasons, we do not address this issue.

nature and scope of the allegations, the purposes behind the filing requirement are satisfied and no injustice or contravention of congressional intent occurs by allowing piggybacking. However, where the party wishing to piggyback has filed his own EEOC charge, policy cuts the other way.

Once the charge is filed, unless it is permissibly modified, the EEOC and the employer are entitled to rely on the allegations contained therein. To allow a plaintiff to file an EEOC charge, file suit upon that charge and then, at the eleventh hour, when the statute of limitations has run, to amend his complaint in reliance on the charge of another belies the policies behind the single filing rule and controverts congressional intent. The employee, by failing to assert a particular allegation in his charge, has necessarily excluded himself from the class of persons purportedly covered by the charge of another. As a result, the EEOC and the employer are given no notice and no opportunity to remedy his complaint. He is bound by the parameters of his own EEOC charge, and cannot subsequently utilize the single filing rule to avoid the statute of limitations.[22] Because the single filing rule was

---

[22]*Cf. Anderson v. Unisys Corp.,* 47 F.3d 302, 308 (8th Cir.1995),

> For those plaintiffs who have never filed an administrative charge and who are allowed to piggyback on the filed claim of another, we deem it reasonable to permit them to join suit as long as the claimant on whose administrative filing they have relied timely files suit after receiving right-to-sue letters from the state and federal agencies.
>
> Those plaintiffs who do file administrative charges, however, should be bound by the statute of

inapplicable, the district court properly denied Trial Plaintiffs'
motion for leave to amend.

## VII. CONCLUSION

For the reasons set forth herein, we affirm the orders and
rulings of the district court.

AFFIRMED.

---

limitations, which in normally stated in the
right-to-sue letter. Even if those plaintiffs are
piggybacking on another employees timely administrative
charge, once they file separate administrative charges,
they cannot rely any further on the other claimant's
actions and must timely file suit after receiving their
right-to-sue letters.