**Sam TEXAS a/k/a Issam
M. Fayad, Plaintiff,**

v.

**CREST ASSET MANAGEMENT, INC.,
d/b/a The Fountain at San Felipe,
Fountainview Houston Apartments,
L.T.D., David Thornton and Reta
Krantz, Defendants.**

**No. Civ.A. H–98–3381.**

United States District Court,
S.D. Texas,
Houston Division.

Feb. 29, 2000.

Peter Costea, Houston, TX, for Plaintiff.

Sam Texas, Houston, TX, plaintiff pro se.

John S. Broude, Broude Smith et al., Ft Worth, TX, Jerry L. Betsill, Broude Smith et al., Ft Worth, TX, for defendants.

## AMENDED MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants Crest Asset Management, Inc., d/b/a The Fountain at San Felipe, Fountainview Houston Apartments, Ltd., David Thornton, and Reta Krantz's Joint Motion for Summary Judgment (# 34). Defendants seek summary judgment on Plaintiff Sam Texas's ("Texas"), a/k/a Issam M. Fayad, claims under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Texas Fair Housing Act ("TFHA"), TEX. PROP.CODE ANN. §§ 301.001–301.171, as well as his claim for intentional infliction of emotional distress under Texas common law. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that Defendants' motion should be granted in part and denied in part.

## I. *Background*

Texas, who is of Lebanese descent, was born in Liberia, Africa. He immigrated to the United States when he was a teenager and became a United States citizen in the 1980s. According to his complaint, he formally changed his name from Issam M. Fayad to "Sam Texas" on July 3, 1998.

In 1987, Texas moved into the Three Fountains II Apartments ("the complex"). In 1996, Defendant Crest Asset Management, Inc. ("Crest") purchased the complex, assuming responsibility for its operation and management. Texas's tenancy remained continuous and uninterrupted through February 1999. He claims that during this period, he diligently paid his rent and performed all his other obligations as a tenant. Texas further contends that, prior to Defendants' purchase of the complex, he never experienced difficulties with the complex's owners or managers.

In 1997, when renovation work was being performed on the complex, a rainstorm caused the ceiling over Texas's bedroom to collapse, allegedly resulting in approximately $15,000.00 in damages to his personal property. He requested reimbursement from Defendant David Thornton ("Thornton"), Senior Vice–President of Crest. Texas claims that Thornton initially refused to pay him or to provide him with the name of the complex's insurance carrier so that he could file a claim. Consequently, on September 23, 1997, Texas filed administrative complaints against Thornton and the complex with the City of Houston, the Department of Housing and Urban Development, and other agencies, alleging violation of his fair housing rights.

Texas asserts that, in the interim, he was unable to live in his apartment due to its damaged condition. In December 1997, Thornton offered him a monetary settlement of $1,500.00 in damages and, according to Texas, an immediate move to a new unit. Texas maintains that Thornton gave him three days to accept the settlement or leave the complex, and that he, therefore, "had no choice but accept the terms of the settlement." Texas signed the settlement agreement on December 23, 1997, but claims that, contrary to Thornton's agreement, he was not given the opportunity to move into a new unit until March 1, 1998. Upon his move to a newly renovated unit, his rent was increased from $450.00 per month to $605.00 per month, consistent with the rental increases required of other tenants moving into renovated units.

Texas asserts that during this period, Thornton, Defendant Reta Krantz ("Krantz"), the manager of the complex, and Kathy Perry ("Perry"), Krantz's predecessor, subjected him to discrimination and harassment based on his national origin. He further maintains that in early 1997, Ester Damlarkaya ("Damlarkaya"), the complex's first manager following Crest's acquisition of the property, specifically told him that the new management had a policy of terminating or failing to renew the leases of tenants of Arabic, African, or Hispanic descent and advised him that Thornton wanted him to leave the complex.

Texas claims that on three occasions in June 1998, he was visited by officers of the Houston Police Department ("the HPD"). These officers allegedly informed him that Thornton was seeking to have him arrested for complaining to authorities about the difficulties he was having with the complex's management. Also in June 1998, a water leak in the ceiling of the new unit caused the roof over his bedroom to collapse, giving rise to damages of approximately $14,000.00 to his personal property. Texas alleges that the damaged property was inspected and photographed by Krantz, management employee Melinda Rawls ("Rawls"), and two of the complex's maintenance employees, all of whom helped him dispose of it in a refuse bin on the premises. Texas maintains that although he complied immediately with a request to provide an itemized list of the damaged property, he has received no compensation to date. Texas further asserts that Krantz told him that "Defendants would not pay [him] anything because that was intended as a lesson to force [him] to leave the apartment complex and go back to Lebanon." He also claims that management again refused to provide him the name of the complex's insurance carrier in order to permit him to make a claim for his property loss. Finally, he complains that he was not given credit on his rent for a three-week period during which time he had to live elsewhere because of the water leak.

On October 13, 1998, Texas instituted this action against Defendants, alleging claims of national origin discrimination and retaliation under the FHA and TFHA and of intentional infliction of emotional distress under Texas common law. Subsequently, on January 13, 1999, Defendants' counsel, Jerry L. Betsill, sent Texas a letter informing him that his lease would not be renewed after it expired on February 28, 1999. Texas asserts that Defendants failed to renew his lease because of discrimination due to his national origin and in retaliation for his complaints about Defendants' discriminatory actions. He seeks recovery of actual, compensatory, and punitive damages as well as prejudgment and postjudgment interest, costs, and attorneys' fees.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving parties, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at

321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *cert. denied,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); *Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773, 776 (5th Cir.1997). " 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' " *Reves v. Ernst & Young,* 507 U.S. 170, 190 n. 3, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. Nonetheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072.

The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir. 1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106

S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. *Discrimination under the FHA and the TFHA*

Both the FHA[1] and the TFHA prohibit discrimination in housing based on race, color, religion, sex, familial status, national origin, and handicap. *See Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521, 530 (5th Cir.1996); *Secretary, United States Dep't of Housing & Urban Dev. v. Blackwell,* 908 F.2d 864, 868 (11th Cir. 1990); *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir.1986); *see also Tien Tao Ass'n, Inc. v. Kingsbridge Park Community Ass'n, Inc.,* 953 S.W.2d 525, 532 (Tex.App.—Houston [1st Dist.] 1997, no pet.). "The stated policy of the Fair Housing Act is 'to provide, within constitutional limitations, for fair housing throughout the United States.' " *Meadowbriar Home for Children, Inc.,* 81 F.3d at 530 (quoting 42 U.S.C. § 3601); *see Dillon v. AFBIC Dev. Corp.,* 597 F.2d 556, 561 (5th Cir.1979). "The Fair Housing Act is 'broad and inclusive' in protecting against conduct which interferes with fair housing rights and is subject to 'generous construction.' " *People Helpers, Inc. v. City of Richmond,* 789 F.Supp. 725, 731 (E.D.Va. 1992) (quoting *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). Similarly, the primary purpose of the TFHA[2] is to "provide for fair housing practices in this state." TEX.PROP.CODE ANN. § 301.002(1).

 A plaintiff seeking recovery on a FHA discrimination claim may proceed under either a theory of disparate treatment or disparate impact (also termed "discriminatory effects"). *See Harris v. Itzhaki,* 183 F.3d 1043, 1051 (9th Cir.1999); *Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1555–56 (5th Cir.), *cert. denied,* 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535

---

1. The FHA provides, in relevant part:

 As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

 (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

 (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

 (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

 (d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

 (e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

 42 U.S.C. § 3604.

2. The TFHA states, in pertinent part:

 (a) A person may not refuse to sell or rent, after the making of a bona fide offer, refuse to negotiate for the sale or rental of, or in any other manner make unavailable or deny a dwelling to another because of race, color, religion, sex, familial status, or national origin.

 (b) A person may not discriminate against another in the terms, conditions, or privileges of sale or rental of a dwelling or in providing services or facilities in connection with a sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin.

 TEX.PROP.CODE ANN. § 301.021.

(1996); *Doe v. City of Butler*, 892 F.2d 315, 323 (3d Cir.1989); *Arthur v. City of Toledo*, 782 F.2d 565, 574–75 (6th Cir.1986); *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 189–90 (7th Cir.1982). "[A] violation of the FHA may be established not only by proof of discriminatory intent, but also by a showing of significant discriminatory effect." *Simms*, 83 F.3d at 1555; *see Hanson*, 800 F.2d at 1386. Here, Texas neither argues nor presents evidence in support of a claim of disparate impact. Thus, the court construes Texas's complaint to allege only a claim of disparate treatment, *i.e.*, intentional discrimination. *See Cavalieri–Conway v. L. Butterman & Assocs.*, 992 F.Supp. 995, 1002 (N.D.Ill.1998), *aff'd*, 172 F.3d 52, 1999 WL 38103 (7th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 121, 145 L.Ed.2d 103 (1999); *see also United States v. Branella*, 972 F.Supp. 294, 298 (D.N.J.1997) (holding that "[i]n the absence of any representation that Plaintiff seeks recovery based on the disparate impact theory, the court must conclude that only an intentional discrimination claim could lie"). Under a disparate treatment analysis, "[t]he protected trait must only be 'one significant factor' in the challenged decision to violate the FHA." *Simms*, 83 F.3d at 1556 n. 30 (quoting *Woods–Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir.1982)); *see Hanson*, 800 F.2d at 1386. " '[I]t is enough to show that race was a consideration and played some role in a real estate transaction.' " *Simms*, 83 F.3d at 1556 n. 30 (quoting *Hanson*, 800 F.2d at 1386).

█ The Fifth Circuit has recognized " 'the strong similarities between the language, design, and purposes of Title VII and the Fair Housing Act.' " *Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1229 (5th Cir. 1996), *cert. denied*, 520 U.S. 1229, 117 S.Ct. 1821, 137 L.Ed.2d 1029 (1997) (quoting *EEOC v. Mississippi College*, 626 F.2d 477, 482 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981)). The TFHA is also substantially similar to the FHA. *See Meadowbriar*

*Home for Children, Inc.*, 81 F.3d at 531 n. 8; *Tien Tao Ass'n, Inc.*, 953 S.W.2d at 532; *see also* Tex.Prop.Code Ann. § 301.002(3) (one purpose of the TFHA is to "provide rights and remedies substantially equivalent to those granted under federal law"). As in employment discrimination cases, a plaintiff can prove discriminatory animus by direct evidence or by an indirect or inferential method of proof. *See Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472, 1476 n. 6 (11th Cir.1993), *cert. denied*, 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994); *Ring v. First Interstate Mortgage, Inc.*, 984 F.2d 924, 927 (8th Cir.1993); *see also Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213, 1216–17 (5th Cir.1995).

In *McDonnell Douglas* and *Burdine*, the United States Supreme Court outlined the burden-shifting framework generally applicable to discrimination cases brought under Title VII cases based on indirect or inferential evidence. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This method of analysis is utilized for claims brought under the fair housing laws, as well. *See Harris*, 183 F.3d at 1051; *Gamble v. City of Escondido*, 104 F.3d 300, 304–05 (9th Cir.1997); *Kormoczy v. United States Dep't of Housing & Urban Dev.*, 53 F.3d 821, 823–24 (7th Cir.1995); *Frazier v. Rominger*, 27 F.3d 828, 831 (2d Cir.1994); *Massaro*, 3 F.3d at 1476 n. 6; *United States v. Badgett*, 976 F.2d 1176, 1178 (8th Cir.1992); *Blackwell*, 908 F.2d at 870; *Chauhan v. M. Alfieri Co.*, 897 F.2d 123, 127 (3d Cir.1990); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir.1984); *Jim Sowell Constr. Co. v. City of Coppell*, 61 F.Supp.2d 542, 545 (N.D.Tex.1999); *Ryan v. Ramsey*, 936 F.Supp. 417, 421 (S.D.Tex. 1996). "The *McDonnell Douglas* test recognizes that direct proof of unlawful discrimination is rarely available." *Badgett*, 976 F.2d at 1178; *see Scales v. Slater*, 181

F.3d 703, 709 (5th Cir.1999); *Jim Sowell Constr. Co.,* 61 F.Supp.2d at 546.

█ Therefore, when there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Rutherford v. Harris County,* 197 F.3d 173, 180 n. 4 (5th Cir.1999); *Harris,* 183 F.3d at 1051; *Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319 (5th Cir.1999); *Gamble,* 104 F.3d at 305; *Michigan Protection & Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 346 (6th Cir.1994); *Ring,* 984 F.2d at 927; *Badgett,* 976 F.2d at 1178; *Blackwell,* 908 F.2d at 870. Once the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Harris,* 183 F.3d at 1051; *Gamble,* 104 F.3d at 305; *Frazier,* 27 F.3d at 831; *Badgett,* 976 F.2d at 1178; *Blackwell,* 908 F.2d at 870; *Betsey,* 736 F.2d at 988; *Jim Sowell Constr. Co.,* 61 F.Supp.2d at 545. If the defendant meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the defendant is merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Harris,* 183 F.3d at 1051; *Gamble,* 104 F.3d at 305; *Badgett,* 976 F.2d at 1178; *Blackwell,* 908 F.2d at 870.

The burden-shifting framework outlined in "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *see Brady v. Fort Bend County,* 145 F.3d 691, 711 (5th Cir.1998), *cert. denied,* 525 U.S. 1105, 119 S.Ct. 873, 142 L.Ed.2d 774 (1999); *Rizzo v. Children's World Learning Ctrs., Inc.,* 84 F.3d 758, 762 (5th Cir. 1996); *Moore v. United States Dep't of Agric.,* 55 F.3d 991, 995 (5th Cir.1995); *Mooney,* 54 F.3d at 1213, 1216; *Massaro,* 3 F.3d at 1476 n. 6; *Ring,* 984 F.2d at 927. "A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden." *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 40 (5th Cir.1996); *see Scales,* 181 F.3d at 708–09. "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 958 (5th Cir.1993); *see Scales,* 181 F.3d at 709 n. 6; *Nichols,* 81 F.3d at 40. It is "that which can be interpreted as an acknowledgement of the defendant's discriminatory intent." *Kormoczy,* 53 F.3d at 824 (citing *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994)); *see Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358–59 (11th Cir.1999). Once a plaintiff has presented *prima facie* evidence of housing discrimination, either through direct or circumstantial evidence, "'summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a [discrimination claim] is the elusive factual question of intentional discrimination.'" *Harris,* 183 F.3d at 1051 (quoting *Lowe v. City of Monrovia,* 775 F.2d 998, 1009 (9th Cir.1985), *amended on other grounds,* 784 F.2d 1407 (9th Cir.1986)); *see Nichols,* 81 F.3d at 40; *Warren v. City of Carlsbad,* 58 F.3d 439, 442 n. 1 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996); *see also Potomac Group Home Corp. v. Montgomery County,* 823 F.Supp. 1285, 1301 (D.Md.1993) ("An analysis of the merits of plaintiffs' claim of [discrimination] requires a determination of the subjective intent of the defendants in engaging in the challenged actions").

█ If the plaintiff produces direct evidence of discrimination, the United States Supreme Court's *Price Waterhouse* mixed-

**730**

motives theory of discrimination comes into play. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 246, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Mooney,* 54 F.3d at 1213, 1216. "Unlike *McDonnell Douglas,* which simply involves a shifting of the burden of production, *Price Waterhouse* involves a shift of the burden of persuasion to the defendant." *Id.* at 1216–17. In other words, "once a plaintiff presents direct evidence of discrimination, the burden of proof shifts to the [defendant] to show that the same adverse [housing] decision would have been made regardless of discriminatory animus." *Belian v. Texas A & M Univ. Corpus Christi,* 987 F.Supp. 517, 522 (S.D.Tex.), *aff'd,* 132 F.3d 1453 (5th Cir.1997); *see Mooney,* 54 F.3d at 1216; *Langley v. Jackson State Univ.,* 14 F.3d 1070, 1075 (5th Cir.), *cert. denied,* 513 U.S. 811, 115 S.Ct. 61, 130 L.Ed.2d 19 (1994). To prevail, the defendant must " 'establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.' " *Id.* (quoting *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993)); *see Price Waterhouse,* 490 U.S. at 252–54, 109 S.Ct. 1775; *Mooney,* 54 F.3d at 1219 n. 18. If the defendant fails to carry this burden, summary judgment is inappropriate.

In this instance, Texas has adduced direct evidence of intentional discrimination under 42 U.S.C. § 3604(a) and (b) and TEX.PROP.CODE ANN. § 301.021. In his affidavit, Texas states:

David Thornton, Reta Krantz, and Kathy Perry subjected me to discriminatory conduct because of my national origin. Specifically, David Thornton, on repeated occasions, called me an Arab terrorist, an F ... Arab, a dumb Arab, a troublemaker, that I am the only individual that ever stood-up against him, that he instructed local apartment management to make my life miserable. He additionally stated, also repeatedly, he wanted me to move out of the complex because I was an Arab, that he did not want Arabs in the complex, that my family was behind the attack against the U.S. Marines in Lebanon, that I was a drug dealer, a child molester, and a habitual criminal. These comments were made to me in 1997 and in 1998.

Reta Krantz, District Manager, also indicated to me, equally frequently, she was going to make my life miserable because I was an Arab, and to do whatever she could to force me out of the complex because I was an Arab. Subsequently, she cut-off the electricity to my apartment approximately 40 times. Reta Krantz made these comments to me throughout 1998. She also made racial slurs to me, cursed me, made death threats against me, and threatened to plant illegal drugs in my apartment complex if I did not voluntarily leave the complex.

Kathy Perry, the Defendants' District Manager prior to Reta Krantz, also indicated to me she wanted me out of the complex because I was an Arab and leveled against me the same invectives and racist comments that David Thornton and Reta Krantz had made. Kathy Perry made those comments to me in 1997.

Ester Damlarkaya was the Defendant's first Apartment Manager after the complex was purchased by Crest Asset Management. She disclosed to me that the policy of the new management was to terminate, or, alternatively, not to renew, the leases of tenants of Arabic descent, Blacks, and Hispanics. She also advised me that David Thornton wanted me out of the property because of my national origin. These comments were made to me in early 1997.

Texas also stated at deposition that Krantz threatened to bomb his apartment. It is uncontested that Defendants refused to renew Texas's lease upon its expiration on February 28, 1999. While Thornton's and Krantz's affidavits attempt to explain some of the adverse housing-related actions of which Texas complains, certain statements

in Texas's affidavit, such as those reciting alleged comments by Thorton, Krantz, and Perry that they did not want Arabs in the complex and that management had been instructed to make his life miserable because he is an Arab, must be taken as true for purposes of summary judgment and constitute direct evidence of discriminatory animus in violation of 42 U.S.C. § 3604(a) and (b) and Tex.Prop.Code Ann. § 301.021. Similarly, Texas's claims of adverse action, including his allegations that Defendants did not reimburse him for the full amount of damages sustained as a result of the two incidents of ceiling collapse, failed to credit his rent for three weeks when his unit was not habitable in 1998, and delayed in providing him a new unit until more than two months after Thornton allegedly agreed to do so, must be regarded as accurate in this context.

Once a plaintiff produces direct evidence of discrimination, the burden of persuasion shifts to the defendant to "establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." *Langley,* 14 F.3d at 1075; *see Price Waterhouse,* 490 U.S. at 252–54, 109 S.Ct. 1775; *Mooney,* 54 F.3d at 1219 n. 18. While not recognizing the correct burden of proof, Defendants have adduced evidence addressing two of the adverse actions of which Texas complains, *i.e.,* failing to compensate Texas for the damages sustained as a result of the June 1998 water leak and failing to renew Texas's lease when it expired on February 28, 1999. In his affidavit and in a letter sent to Texas on July 10, 1998, Thornton states that the apartment complex is not liable for any damage done to Texas's personal property because it was not caused by Defendants' negligence and, thus, under the lease, Defendants were not responsible for the loss. In his affidavit, Thornton also points out that Texas's lease expired by its own terms on February 28, 1999, and asserts that it was not renewed for business reasons, as Texas's behavior had become "erratic and fearsome." He states:

Texas had been abusive to management staff, had made disparaging and slanderous statements to other tenants about management staff, that his behavior was erratic and could present a problem of safety for the management staff and other tenants, and based on the fact that maintenance and repairs at Mr. Texas' apartment were more expensive, in that additional precautions were required to be taken before and while any routine maintenance or repairs were undergone. In addition, Mr. Texas' rent was under the market rate by approximately 10%.

Krantz states in her affidavit that she "concurred with David Thornton's decision not to renew Mr. Texas' lease in February of 1999, based on purely business reasons. I believed at the time, and continue to believe that Mr. Texas was a disruption to the apartment community, that he posed a risk to me, my staff, and other tenants, and that he needed to move to another location." Defendants further note that they allowed Texas to renew his lease in 1998 and provide statistics indicating that on April 30, 1998, approximately one-third of the complex's apartments were occupied by minorities. Defendants also vehemently deny Texas's allegations that they shut off his electricity, made death threats, threatened to bomb his apartment, summoned the police to his home, threatened to plant illegal drugs in his apartment, and announced plans to make his life "miserable." Defendants' evidence, however, fails to address Texas's claims regarding the December 1997 settlement agreement, including his contention that he was given only three days to agree to the settlement or move out and that Thornton told him he could immediately move into a newly renovated unit as part of the settlement but failed to provide him a new unit until over two months later. In addition, they make no attempt to refute the disparaging statements attributed to Perry. Thus, Defendants have failed to present evidence controverting all of Texas's claims.

Furthermore, in his affidavit, Texas disputes the truth of the assertions contained in Thornton's and Krantz's affidavits. He asserts, "I have never been abusive to complex management, I have never made any disparaging and slanderous statements to other tenants about complex management, and my behavior has never been erratic," "I have never received any complaints from any tenants about my behavior," and "I have never threatened or verbally abused Reta Krantz." Although Defendants have submitted evidence, through the affidavits of Thornton and Krantz, rebutting some of the allegations contained in Texas's affidavit, they have not met their burden of persuasion to demonstrate, by a preponderance of the evidence, that the alleged adverse actions would have been taken regardless of Texas's national origin. Hence, Texas's affidavit is sufficient to raise an issue of fact as to whether Defendants discriminated against him based on his national origin in violation of 42 U.S.C. § 3604(a) and (b) and Tex.Prop.Code Ann. § 301.021. Texas, however, has presented no evidence to support a claim under the remaining provisions of § 3604. Thus, because there exist genuine issues of material fact with respect to four of Texas's housing discrimination claims, summary judgment is not warranted on those claims. Summary judgment is proper, however, on Texas's claims under 42 U.S.C. § 3604(c)–(e), as Texas has proffered no evidence in support of those claims.

## C. Retaliation Under the FHA and the TFHA

Texas further maintains that Defendants retaliated against him under the FHA. The retaliation clause of the FHA provides:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed ... any rights granted or protected by section 3603, 3604 ... of [the FHA].

42 U.S.C. § 3617.[3]

Under its terms, § 3617 "safeguards members of the protected class from coercion, intimidation, threats, or interference in the exercise or enjoyment of their Fair Housing Act rights." *Frazier*, 27 F.3d at 833; *see Potomac Group Home Corp.*, 823 F.Supp. at 1294. "By its plain language, § 3617 is applicable when an individual has been deprived of the exercise and enjoyment of any right granted or protected by section 3603, 3604 ... of this title." *Michigan Protection & Advocacy Serv., Inc. v. Babin*, 799 F.Supp. 695, 723 (E.D.Mich. 1992), *aff'd*, 18 F.3d 337 (6th Cir.1994) (citations omitted). It "is not limited to

**3.** The regulations promulgated pursuant to this section state:

(b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this part.

(c) Conduct made unlawful under this section includes, but is not limited to, the following:

(1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

\*\*\*

(4) Intimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, rights granted or protected by this part.

(5) Retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.

24 C.F.R. § 100.400.

those who used some sort of 'potent force or duress,' but extends to other actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus." *Babin,* 18 F.3d at 347. The TFHA does not contain an equivalent provision, although it provides a criminal penalty for retaliatory actions similar to those prohibited by the FHA. *See* TEX. PROP.CODE ANN. § 301.171.

■ Retaliation claims brought pursuant to the FHA are analyzed under the same standards that are applied to retaliation claims brought under Title VII and other employment discrimination statutes. *See, e.g., Caractor v. Town of Hempstead,* 159 F.3d 1345, 1998 WL 536385, at *2 (2d Cir. June 11, 1998); *Broome v. Biondi,* 17 F.Supp.2d 211, 218–19 (S.D.N.Y.1997). As with other anti-discrimination statutes, if there is no direct evidence of retaliation, "the [plaintiff] bears the burden of proving that the [defendant's] actions were motivated by the considerations prohibited by the statute." *Hypes v. First Commerce Corp.,* 134 F.3d 721, 726 (5th Cir.1998); *see Damon,* 196 F.3d at 1358–59; *Fox v. Certainteed Corp.,* 198 F.3d 245, 1999 WL 1111495, at *5 (6th Cir. Nov.23, 1999); *Broome,* 17 F.Supp.2d at 218–19. The Fifth Circuit has held that the burden-shifting technique applicable to Title VII disparate treatment claims also applies to claims of unlawful retaliation. *See Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996) (citing *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983)).

■ In the case at bar, Texas has set forth allegations in his affidavit, which, if true, can be viewed as direct evidence of retaliation in violation of the FHA. As noted above, Texas states that after he filed an administrative complaint of housing discrimination, Thornton told him that he was "the only individual that ever stood-up against him, [and] that he instructed local apartment management to make [his] life miserable." He further asserts that following the June 1998 water

leak damage, Krantz told him "Defendants would not pay [him] anything because that was intended as a lesson to force me to leave the apartment complex." He claims that on three occasions in June 1998 he was visited by HPD officers at the behest of Thornton, who "sought to have [him] arrested for having complained to the authorities about the difficulties [he] was having with the management at the apartment complex." In addition, Texas's affidavit and deposition testimony indicate that Krantz cut off the electricity to his apartment on approximately 40 occasions, made death threats against him, and threatened to bomb his apartment. Texas also complains that Defendants failed to renew his lease after February 28, 1999, in retaliation for his filing the instant lawsuit.

It is apparent that Defendants were aware of Texas's complaints of housing discrimination as early as September 17, 1997, as evidenced by Thornton's affidavit and a copy of the complaint Texas filed against the complex and Thornton on that same date. The conduct about which Texas now complains took place primarily after Defendants learned of his complaints. Courts have held that conduct similar to that alleged by Texas can constitute a violation of § 3617. *See Sofarelli v. Pinellas County,* 931 F.2d 718, 722 (11th Cir. 1991) (racially motivated defendants' "leaving a note threatening 'to break [plaintiff] in half' if he did not get out of the neighborhood and running up to one of [plaintiff's] trucks, hitting it, shouting obscenities and spitting at [plaintiff] ... clearly constitute coercion and intimidation under § 3617"); *Evans v. Tubbe,* 657 F.2d 661, 662, 663 n. 3 (5th Cir.1981) (threats, intimidation, and harassment based on race arguably violate § 3617); *Wilstein v. San Tropai Condominium Master Ass'n,* No. 98 C 6211, 1999 WL 262145, at *8 (N.D.Ill. Apr. 22, 1999) (allegation that defendant telephoned police and threatened criminal prosecution if disabled plaintiff did not move car from grass next to handicapped parking space stated a claim under

§ 3617); *People Helpers Found., Inc. v. City of Richmond,* 781 F.Supp. 1132, 1135–36 (E.D.Va.1992) (communicating threats through the police as well as organizing neighbors to threaten and intimidate a corporation that provided housing to black and disabled people may constitute "interference, intimidation, or coercion" under § 3617).

While Texas has proffered direct evidence of retaliatory conduct, Defendants have again failed to meet their burden of persuasion. In rebuttal, along with denying Texas's allegations, Thornton states in his affidavit:

> The fact that Mr. Texas had brought a discrimination claim against Crest, Fountainview Houston Apartments Ltd., Reta Krantz, and myself was not the reason that I decided to not renew Mr. Texas' lease. In fact, Mr. Texas had made a previous complaint with the City of Houston alleging discrimination, yet we renewed his lease.

As with Texas's discrimination claim, the evidence Defendants present in rebuttal to his retaliation claim fails to address many of Texas's allegations and is in large part disputed by Texas's affidavit. Hence, Defendants have not shown, by a preponderance of the evidence, that they would have made the same decisions without regard to Texas's complaints about the complex. As a consequence, genuine issues of material fact remain as to Texas's allegations of retaliation under the FHA, precluding summary judgment on that claim.

### D. *Intentional Infliction of Emotional Distress*

■ Texas also asserts a claim for intentional infliction of emotional distress under Texas common law. To prevail on a claim for intentional infliction of emotional distress under Texas law, Texas must establish:

(1) Defendants acted intentionally or recklessly;

(2) Defendants' conduct was extreme and outrageous;

(3) Defendants' actions caused him emotional distress; and

(4) the emotional distress suffered by him was severe.

*See Hart,* 127 F.3d at 452; *Ward v. Bechtel Corp.,* 102 F.3d 199, 203 n. 2 (5th Cir.1997); *Burden v. General Dynamics Corp.,* 60 F.3d 213, 218 (5th Cir.1995); *MacArthur v. University of Tex. Health Ctr.,* 45 F.3d 890, 898 (5th Cir.1995); *Mattix–Hill v. Reck,* 923 S.W.2d 596, 597 (Tex. 1996); *Johnson,* 891 S.W.2d at 644; *Twyman v. Twyman,* 855 S.W.2d 619, 621–22 (Tex.1993).

Although "extreme and outrageous," as used in the second element of this standard, is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is "outrageous" if it is "atrocious" and surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *See McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 564 (5th Cir.1998); *MacArthur,* 45 F.3d at 898; *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 243 (5th Cir.1993); *Johnson v. Merrell Dow Pharm., Inc.,* 965 F.2d 31, 33 (5th Cir. 1992); *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 306 (5th Cir.1989); *Johnson,* 891 S.W.2d at 644. In *Dean,* the Fifth Circuit (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)) explained:

> Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *See Ugalde,* 990 F.2d at 243; *Johnson,* 965 F.2d at 33; *Wilson v. Monarch*

*Paper Co.*, 939 F.2d 1138, 1143 (5th Cir. 1991). "There is no occasion for the law to intervene in every case where someone's feelings are hurt." *Johnson*, 965 F.2d at 33.

■ In this situation, Texas has alleged conduct by Defendants that could be construed as extreme and outrageous behavior. In his affidavit, he claims that, on numerous occasions, Thornton called him "an Arab terrorist, an F ... Arab, a dumb Arab, [and] a troublemaker," told him that he had "instructed local apartment management to make [his] life miserable," repeatedly stated that he wanted Texas to leave the complex because he was an Arab, and asserted "that he did not want Arabs in the complex, that [his] family was behind the attack against the U.S. Marines in Lebanon, [and] that [he] was a drug dealer, a child molester, and a habitual criminal." He further complains that Krantz frequently stated that she was going to make his life miserable because he is an Arab and that she uttered racial slurs to him, cursed him, made death threats against him, and threatened to plant illegal drugs in his apartment. Texas maintains that Perry made similar remarks. One Texas court of appeals has held that, taken as a whole, evidence that the plaintiff was called a "son of a bitch" and a "mother f_____," was asked if he were a "Nazi or a fascist" and whether he "had received a lobotomy as a child," and was the target of false rumors constituted extreme and outrageous conduct by a hospital and some of its employees. *See American Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 341–44 (Tex.App.—Houston [14th Dist.] 1991, no writ); *see also GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 616 (Tex. 1999) (holding that conduct must be considered as a whole in determining whether it was extreme and outrageous for purposes of an intentional infliction of emotional distress claim). Hence, the conduct alleged by Texas, if true, could be viewed as surpassing "all possible bounds of decency" and so vile or reprehensible as to be "utterly intolerable in a civilized community." *See Dean*, 885 F.2d at 306.

Texas, however, has not shown that any emotional distress he may have suffered was severe. For a claim of intentional infliction of emotional distress to be cognizable under Texas law, there must be "sufficient proof of severe emotional distress, wholly apart from any outrageous conduct on the defendant's part." *Tidelands Auto. Club v. Walters*, 699 S.W.2d 939, 944 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.); *see Badgett v. Northwestern Resources Co.*, 818 F.Supp. 998, 1003 (W.D.Tex.1993). "Severity of distress is an element of the cause of action, not simply a matter of damages." *Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1992, writ denied) (citing *K.B. v. N.B.*, 811 S.W.2d 634, 640 (Tex.App.—San Antonio 1991, writ denied), *cert. denied*, 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992)).

■ "Emotional distress" means any highly unpleasant mental reaction such as extreme grief, shame, humiliation, embarrassment, anger, disappointment, worry, and nausea. *See Behringer v. Behringer*, 884 S.W.2d 839, 844 (Tex.App.—Fort Worth 1994, writ denied); *see also Badgett*, 818 F.Supp. at 1003; *Washington*, 887 S.W.2d at 216; *Tidelands Auto. Club*, 699 S.W.2d at 941. In order to recover damages, however, the plaintiff must prove more than mere worry, anxiety, vexation, embarrassment, or anger. *See McCray v. DPC Indus., Inc.*, 875 F.Supp. 384, 392 (E.D.Tex.1995) (citing *Regan v. Lee*, 879 S.W.2d 133, 136 (Tex.App.—Houston [14th Dist.] 1994, no writ)); *Haryanto v. Saeed*, 860 S.W.2d 913, 923 (Tex.App.—Houston [14th Dist.] 1993, writ denied). "The law intervenes only where the distress is so severe that no reasonable person should be expected to endure it." *Behringer*, 884 S.W.2d at 844 (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965)). Thus, in *Benavides*, the court found the plaintiff's admission that she had not consulted any mental health professionals and did not

intend to do so to be indicative "that whatever actual distress [she] suffered, it did not rise to the level that a reasonable person could not be expected to endure." 848 S.W.2d at 196.

■ In this instance, Texas has not demonstrated that he sustained severe emotional distress as a result of Defendants' conduct. He does not claim to have experienced any psychiatric problems due to Defendants' actions, like those encountered by the plaintiff in *Johnson. See* 965 F.2d at 33. He certainly does not contend that he is suffering from anything approaching the possibly suicidal, manic-depressive illness and bipolar disorder experienced by the plaintiff in *Wilson* or the debilitating headaches alleged by the plaintiff in *Clayton. See Wilson,* 939 F.2d at 1141; *Clayton v. Nabisco Brands, Inc.,* 804 F.Supp. 882, 885 (S.D.Tex.1992); *Giurintano,* 821 S.W.2d at 343. Texas also has not alleged that he is afflicted with post-traumatic stress syndrome, as diagnosed in *Haryanto. See* 860 S.W.2d at 922. As in *Benavides,* there is no evidence that Texas has consulted any mental health professionals about his purported emotional distress or that he has any intention of doing so. *See* 848 S.W.2d at 195–96. Indeed, he has presented no evidence that he has suffered any form of emotional distress. Under these circumstances, Texas's claimed emotional distress cannot be said to be "so severe that no reasonable person could be expected to endure it." *Id.* at 195 (citing *K.B.,* 811 S.W.2d at 640).

Therefore, Texas has failed to adduce sufficient facts to support one of the required elements of an intentional infliction of emotional distress claim under Texas law—severe distress. Accordingly, summary judgment on this claim is mandated.

### III. *Conclusion*

Texas has failed to present a claim that would entitle him to relief on his claims of fair housing violations under 42 U.S.C. § 3604(c)–(e) and his claim of intentional infliction of emotional distress under Texas law. There exist no outstanding issues of material fact on these claims, and Defendants are entitled to judgment as a matter of law. Thus, Defendants' motion for summary judgment on the issues of discrimination under 42 U.S.C. § 3604(c)–(e) and intentional infliction of emotional distress is GRANTED.

Genuine issues of material fact remain, however, as to whether Defendants discriminated against Texas in violation of 42 U.S.C. § 3604(a) and (b) and Tex.Prop. Code Ann. § 301.021 or retaliated against him in violation of 42 U.S.C. § 3617. Therefore, this action will proceed to trial on the claims raised under these statutes. Consequently, Defendants' motion for summary judgment on the issues of housing discrimination under 42 U.S.C. § 3604(a) and (b) and Tex.Prop.Code Ann. § 301.021 and retaliation under 42 U.S.C. § 3617 is DENIED.

IT IS SO ORDERED.